**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**PINE BLUFF DIVISION**

**SHAUN C. ALLEN,**
**ADC #158525**                                                                      **PLAINTIFF**

**V.**                                **CASE NO. 5:17-CV-302-BRW-BD**

**WENDY KELLEY,** *et al*.                                                   **DEFENDANTS**

<u>**RECOMMENDED DISPOSITION**</u>

**I.    <u>Procedures for Filing Objections</u>**

This Recommendation has been sent to Judge Billy Roy Wilson. Any party may

file objections if they disagree with the findings or conclusions set out in the

Recommendation. Objections should be specific and should include the factual or legal

basis for the objection. And, to be considered, objections must be filed with the Court

Clerk within 14 days.

If no objections are filed, Judge Wilson can adopt this Recommendation without

independently reviewing the record. If parties do not file objections, they may waive their

right to appeal questions of fact.

**II.    <u>Background</u>**

Plaintiff Shaun C. Allen is an inmate at the Cummins Unit of the Arkansas

Division of Correction (ADC). In his complaint, Mr. Allen claims that Defendants used

excessive force against him and failed to intervene during a September 14, 2017 incident

at the prison. (Docket entries #2, #44) Specifically, he alleges that the emergency

response team (ERT) and hoe squad riders did not give him an opportunity to surrender

before using tear gas and shooting into the barracks while he was lying face-down on the bathroom floor. (#2, p.4) He alleges that, because of the Defendants' conduct, he suffered damages, including hearing loss. (#2, p.6)

Defendants have moved for summary judgment (#201); and Mr. Allen has responded to the motion. (#209)

## III.    Standard

In a summary judgment, the court rules in favor of a party without the need for a trial. The court can grant summary judgment only if the evidence shows that there is no real dispute about any fact that is important to the outcome of the case. In deciding a motion for summary judgment, the court views any disputed facts in a light most favorable to the non-moving party. *O'Neil v. City of Iowa City, Iowa*, 496 F.3d 915, 917 (8th Cir. 2007). FED.R.CIV.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322B23 (1986).

## IV.    Undisputed Facts

On September 14, 2017, and at all times relevant to the issues in this lawsuit, Mr. Allen was in 10B Barracks in the East Hall of the Cummins Unit. (#2, p.4; #202, p.1; #210, p.2) Along the East Hall, there is a dining hall, an infirmary, offices, and housing units. (#201-2, p.1) The housing units are separated from the dining hall, infirmary, and offices by a climate-control door and the East 1 riot gate. (#201-2, p.1) Riot gates are sliding metal doors and metal bars. (#201-2, pp.1, 25)

Beyond the East 1 riot gate, there are eight barracks, numbered 9 through 16. (#201-2, p.2) A hallway divides the barracks, with odd-numbered barracks on the left side of the hallway and even-numbered barracks on the right side of the hallway. (#201-2, pp.2, 31) East 2 riot gate separates 9 and 10 barracks from 11 and 12 barracks. (#201-2, p.2) East 3 riot gate separates 11 and 12 barracks from 13 through 16 barracks. (#201-2, p.2)

A wall separates each barracks into A and B sides. (#201-2, pp.2, 11) Each barracks has a control booth with windows looking into each side of the barracks and into the hallway. (#201-2, pp.2, 11) Each barracks also has a communal bathroom on the back wall that is separated from the rest of the barracks by a half wall. (#201-2, pp.3, 11) It is approximately 100 feet from the front wall of the barracks to the half wall in front of the bathroom. (#201-2, p.3) Just outside the bathroom area, there is an emergency exit door which opens directly to the outside of the barracks. (#201-2, p.3)

On the night of September 14, 2017, an inmate assaulted an officer in 9B Barracks of the Cummins Unit. (#201-3, p.1) The officer was safely removed, but the inmates refused to allow officers to remove the inmate who had assaulted the officer or to comply with other orders. (#201-2, p.3) The inmates began making weapons from parts of the heat and air system and used the make-shift weapons to break glass. (#201-3, p.1) Captain Defendant Daniel ordered staff to leave the East 2 area (the area between East 1 riot gate and East 2 riot gate) and directed the radio tower to activate a cautionary riot

3

alert, even though the situation had not yet devolved into a riot. (#201-3, p.2) The radio tower notified Defendants Straughn, Budnik, Robertson, Fitzpatrick, and other emergency staff of the situation and ordered them to respond. (#201-3, p.2)

Major Daniels and Deputy Warden Budnick, who are both Defendants, went to the hallway outside of 9B Barracks and ordered the inmates to lie on their beds and send out the inmate who had assaulted the officer. (#201-3, p.2) The inmates refused and threatened to assault any staff who entered the barracks. (#201-3, p.2) Defendants Budnick, Straughn, and Robertson again attempted to convince the inmates to send out the inmate who had assaulted the officer. (#201-2, p.4) The inmates refused to comply. (#201-2, p.4)

While officials were working on a plan to deescalate the situation, inmates broke the control booth window inside 9B Barracks and unlocked the barracks doors for both sides of 9, 10, 11, and 12 Barracks. (#201-3, p.3) Defendants Budnik, Robertson, and Fitzpatrick were able to stop inmates before they charged through East 1 riot gate by waving less-than-lethal munitions that were not yet loaded.[1] (#201-2, p.4) Defendants Budnik, Robertson, and Fitzpatrick called for help. (#201-2, p.5)

According to Defendant Daniel, officials feared that the disturbance would spread if they allowed inmates to remain in the hallway. (#201-3, p.5) Once Defendants Strother,

---

[1] The ADC's Emergency Response Teams use less-than-lethal munitions when responding to disturbances. Twelve-gauge shotguns can be loaded with rubber balls or other projectiles. (#201-1, p.1)

Johnson, and Powell arrived at East 1 riot gate, Defendants Strother and Johnson used less-than-lethal munitions to force the inmates from the hallway back into their barracks to keep the disturbance from spreading beyond that area. (#201-5, p.3) Defendant Shores, who is the Emergency Preparedness and Administrator for the ADC and commander of the Central K9 Unit, was notified that the situation had escalated. (#201-1, pp.1,5) He advised officials to keep the inmates in their barracks and he called the Central K-9 Unit, Pine Bluff Complex's ERT, and Delta Unit's ERT for help. (#201-1, pp.5-6)

Defendants Strother, Johnson, and Powell stayed at East 1 riot gate until other officers could arrive. Inmates were throwing batteries, shards of glass, and other projectiles at the officers. (#201-7, p.3) Inmates also flashed homemade weapons and slid them across the hall to one another. (#201-7, p.3) At that point, Defendants Johnson, Strother, Robert Watson, and Stephen Watson fired less-than-lethal rounds into the hallway, so that they could safely enter. (#201-7, p.4)

By the time Defendant Shores arrived, the Cummins Unit officers had contained the disturbance by denying inmates access to the hallway; however, inmates in 9B and 10B Barracks had barricaded their doors and were refusing to surrender. (#201-1, p.6) Defendant Shores went to East 1 riot gate and repeatedly ordered the inmates to come to the hallway and lie face-down if they were not involved so that they could be removed. (#201-1, p.6) None of the inmates surrendered. (#201-1, p.6)

Defendant Shores then left the area to develop a plan to force entry through the emergency door in the back of 9B Barracks by going outside the building. (#201-1, p.6) As officials forced their way in, Defendant Maples deployed one stinger grenade and one canister of tear gas into the back of 9B Barracks so that officials could safely enter the barracks.[2] (#201-1, p.7)

Once inside the barracks, the team made a tactical sweep through the room and each inmate was ordered to lie face down, show his hands, and submit to hand restraints. (#201-1, p.8) Some inmates in 9B Barracks advanced on staff after ignoring the order and Defendant Griffith fired less-than-lethal shotgun rounds at any advancing inmate. (#201-13, p.9) Defendants Powell and Watson both deployed tasers to subdue combative inmates. (#201-13, pp.12, 14)

Meanwhile, some 10B inmates continued to throw batteries and glass at the officers in the hallway. (#201-7, p.4) Defendants Strothers, Robert Watson, and Davidson each fired less-than-lethal rounds from the hallway into 10B Barracks to discourage this behavior. (#201-7, p.4) According to Mr. Allen, theses rounds were fired for 25 to 30 minutes. (#210, p.10)

After the entry team regained control of 9B Barracks, ADC officials brought large fans and opened doors to ventilate the area and clear the tear gas. (#201-2, p.6) In his

---

[2] Stinger grenades are hard rubber shells filled with rubber balls. They can contain a chemical agent, such as pepper spray or tear gas. When detonated, the rubber casing explodes, and rubber balls fly within a 50-foot radius. (#201-1, p.3)

affidavit, Defendant Shores testified that the inmates in 9A and 10A Barracks were fully compliant, and all inmates lay on their racks. (#201-1, p.8; #201-2, p.7) Some 10B inmates, however, continued to refuse orders. (#201-1, p.8; #201-2, p.7)

At this point, Defendant Shores and his team did not believe it was necessary to deploy munitions, stinger grenades, or tear gas canisters before entering 10B Barracks. (#201-1, p.8) After they entered 10B Barracks, the Central K9 Unit formed a tactical line and worked their way through the barracks ordering inmates to lie face down, to show their hands, and to submit to hand restraints. (#201-1, p.8; #201-7, p.5) All 10B Barracks inmates were compliant; and no weapons or chemical agents were deployed once the officers entered the barracks. (#201-1, p.8; #201-7, p.5)

At all times relevant, Mr. Allen was behind the bathroom half wall in the shower area at the rear of 10B Barracks. (#201-19, p.2; #209, p.2). It is approximately 100 feet from the front wall of 10B Barracks to the bathroom half wall, and the maximum effective range of the rounds shot into the barracks is 35 feet. (#201-2, p.8; #201-7, p.6) After both 9B and 10B Barracks were cleared, all inmates were evaluated by medical officials. (#201-2, p.7)

## V.   Discussion

### A.    Official Capacity Claims

Mr. Allen has sued the Defendants in both their individual and official capacities and seeks damages. Under settled law, civil litigants cannot recover damages from state

actors sued in their official capacities. *Will v. Michigan Dep't of State Police*, 491 U.S. 58 (1989). Therefore, the official-capacity claims should be summarily dismissed.

  B.  Claims and Defendants that Should Be Dismissed

  Mr. Allen did not exhaust grievances against Defendants related to an alleged failure to train correction officers or failure to intervene. The Court has already ruled that Mr. Allen cannot pursue those claims. (#161; #164)

  Mr. Allen is also barred from pursuing claims on behalf of other inmates. *Roubideaux v. N.D. Dep't of Corr. & Rehab.,* 570 F.3d 966, 972 (8th Cir. 2009); *Johnson v. State of Mo.*, 142 F.3d 1087, 1088 (8th Cir. 1998) (to establish standing, a prisoner must demonstrate he personally suffered an injury-in-fact that is fairly traceable to the defendant's conduct). And, because Mr. Allen remained in 10B Barracks throughout the incident, he is limited to claims of excessive force in 10B Barracks only.

  Mr. Allen did not complain about the use of hand restraints in his Complaints or in his exhausted grievances, so he cannot pursue claims related to Defendants' use of hand restraints in this lawsuit. This lawsuit concerns only claims that Defendants used excessive force in 10B Barracks that left him with hearing loss and breathing difficulty resulting from exposure to tear gas. (#2; #33; #44; #134)

  It is undisputed that only three Defendants used tactical force in 10B Barracks: Defendants Eric Strothers, Robert Watson, and William Davidson. Therefore, claims against the remaining Defendants, who did not use such force, should not move forward.

Accordingly, Defendants Wendy Kelley, Zack Coleman, K. Banks, K. Courtney, Jonnie Giddens, D. Johnson, Marque Martin, Leo Murray, Lee Randle, Marvin Turner, Timothy Pratt, Randy Shores, Jeremy Campbell, Chris Brown, Jonathan Lawrence, Tony Baugh, Dennis Reap, Eddie Allen, Jonathan Smart, Louis Skinner, Jeremy Evans, Jeff Patton, Chris Bennett, Rocky Foster, Kantasious Tate, Jerome Eason, Aubrey Walker, Katrina Barrow, Derek Lauhon, Michael Ingram, Jon Jackson, Erica Wright, Clint Stanley, Jonathan Taylor, Keedren King, William Straughn, Christopher Budnick, Vernon Robertson, Johnathan Powell, William Lewis, David Mowles, Stephen Lofton, Shyrome Hadley, Merlin Fitzpatrick, Jimmy Coleman, Cantrell Bass, Morris Collins, Claybourne Cosen, Clyde Daniels, Clemel Penn, LaTasha Taylor, Andre Trotter, Monterrance Garner, Raheen Hawthorne, Kaneichua Johnson, David Lambert, Keith Mallett, Joshua McCorew, Wallace Mitchell, Alex Smith, John Maples, Richard Eddie Powell, Chris Griffith, Ronald Watson, Stephen Watson, and Christopher Johnson must be DISMISSED from this lawsuit.

C.    Qualified Immunity

To determine whether qualified immunity shields the Defendants from liability, the Court must determine "whether the facts alleged or shown, construed in the light most favorable to [Mr. Allen], establish the violation of a constitutional or statutory right," and "whether that constitutional right was clearly established as of [the time of the relevant conduct], such that a reasonable official would have known that [his or her] actions were

9

unlawful." *Scott v. Benson*, 742 F.3d 335, 339 (8th Cir. 2014) (quoting *Krout v.*

*Goemner*, 583 F.3d 557, 564 (8th Cir. 2009). Importantly, those two issues may be

addressed in any order. *Ashcroft v. Al-Kidd*, 131 S. Ct. 2074, 2084 (2011).

      To prevail on an Eighth Amendment excessive force claim, Mr. Allen must

demonstrate that the Defendants used force "maliciously and sadistically to cause harm,"

rather than in "a good-faith effort to maintain or restore discipline." *Hudson v.*

*McMillian*, 503 U.S. 1, 6-7 (1992); *Santiago v. Blair,* 707 F.3d 984, 990 (8th Cir. 2013).

Was force needed? Was the degree of force Defendants used reasonable under the

circumstances? What injuries resulted from the force Defendants used? *Whitley v. Albers*,

475 U.S. 312, 321 (1986).

      Mr. Allen alleges that he was in the bathroom when Defendants Strothers, Robert

Watson, and Davidson shot rounds from the hall that blew a hole in the wall next to him.

The Defendants have come forward with evidence that the bathroom was at least 100 feet

from where they stood when they fired rounds into 10B Barracks; and that the effective

range of the shotgun rounds was no more than 35 feet. Mr. Allen has not come forward

with evidence to dispute the physical layout of 10B Barracks or the Defendants' account

of where they stood as they fired. Therefore, Mr. Allen's version of the facts simply

could not have occurred as alleged. *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When

opposing parties tell two different stories, one of which is blatantly contradicted by the

record, so that no reasonable jury could believe it, a court should not adopt that version of

the facts for purposes of ruling on a motion for summary judgment.").

Furthermore, Mr. Allen cannot show, nor does he even allege, that Defendants acted maliciously. The undisputed facts do not support an inference of malicious or sadistic intent. Rather, the facts show that Defendants were attempting to restore order after a riot broke out in East Hall. Inmates in 10B Barracks launched batteries and glass at the officers in the hallway; and Defendants fired less-than-lethal rounds from the hallway into 10B Barracks to discourage that behavior. Thereafter, team of officers entered 10B Barracks from the hallway through the front door, and no more shots were fired. Based on this undisputed evidence, there are no facts to support a finding that Defendants acted with malicious or sadistic intent. Accordingly, the Defendants are entitled to qualified immunity.

## VI.  **Conclusion**

The Court recommends that Defendants' motion for summary judgment (#201) be GRANTED and that this lawsuit be DISMISSED, with prejudice.

DATED, this 4th day of March, 2020.

_____
UNITED STATES MAGISTRATE JUDGE